**Vivia AMALFITANO and Gerard Amalfitano, Plaintiffs,**

v.

**Armand J. ROSENBERG, Defendant.**

**No. 04 Civ.2027(NRB).**

United States District Court,
S.D. New York.

April 20, 2006.

Richard E. Hahn, New York, NY, for Plaintiffs.

William J. Davis, Scheichet & Davis, P.C., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiffs Vivia Amalfitano ("Mrs.Amalfitano") and Gerard Amalfitano, Esq. ("Mr.Amalfitano") (collectively, "plaintiffs" or "the Amalfitanos") have brought this diversity action against attorney Armand J. Rosenberg, Esq. ("defendant" or "Rosenberg"). Plaintiffs allege that Rosenberg violated New York Judiciary Law § 487 (" § 487") in the course of his representation of Mrs. Amalfitano's uncle, Peter Costalas ("Peter"), who was the plaintiff in an earlier lawsuit brought against the Amalfitanos in New York state court. For the reasons stated below, we find that Rosenberg engaged in conduct that violated § 487.

## BACKGROUND [1]

### I. Overview

Plaintiffs' claim is based on § 487, which states that an attorney who

[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Jud. Law § 487 (McKinney 2005). Plaintiffs assert that, in violation of § 487, Rosenberg brought a lawsuit accusing them of orchestrating a fraudulent sale of the family business to themselves despite knowing from his own prior representation that Peter had earlier forfeited his interest in the family business because of his misdeeds. In short, Rosenberg brought suit against plaintiffs despite knowing that it was entirely baseless. Plaintiffs allege that Rosenberg's knowledge gained from his prior representation of Peter, combined with various other actions of questionable ethical or professional propriety, support the conclusion that he acted with the intent to deceive.

Defendant responds by arguing that plaintiffs have at best shown "frivolous conduct" on his part, *see* Trial Tr. 546, which does not rise to the level of intentional deceit, as required under § 487. Moreover, defendant contends that even if the conduct rose to the level of intentional deceit, plaintiffs have failed to establish reliance on his alleged acts of deceit as required by § 487.

### II. The Original Dispute

The Costalas brothers, Peter, James, and John, were at one time engaged in a family real estate and restaurant business. The three Costalas brothers shared the responsibility of managing the twelve restaurants and five buildings which comprised the family business. James focused on the operational aspects of running the restaurants, John supervised the building of the restaurants, and Peter oversaw finances. *Id.* at 32–33.

Unbeknownst to James and John, Peter engaged in a series of personal business transactions which ultimately contributed to the loss of four of the family-owned buildings and eleven of the businesses' restaurants. *Id.* In doing so, Peter improperly diverted approximately eight to ten million dollars from the family businesses. *Id.* at 50. Some of this money, it appears, was used to subsidize his "palatial" apartment, which was filled with imported Italian marble and overlooked Central Park. *Id.* at 158. Moreover, Peter had been accumulating significant debts in the course of his personal investing, specifically through extensive trading in options. In an effort to cover his losses, Peter began writing checks to himself from the business accounts and forging the signatures of various family members on bank documents in order to obtain financing. *Id.* at 34, 37. In 1989, family members learned that Peter had heavily mortgaged the family-owned buildings and that the businesses were in danger of being lost. *Id.* at 34. Family members also faced the consequences of Peter's actions directly, with some of them facing foreclosure on their homes due to Peter's forging of their signatures. *Id.* As a result of Peter's actions, the Costalas family lost four of five buildings and eleven of twelve restaurants. *Id.* at 32. Peter subsequently was forced out of the business in 1993.[2]

---

1. The following constitutes this Court's findings of fact following trial.

2. Peter's personal tax returns reflect this chronology, as they cease to include any part-

Rosenberg's representation of Peter began in the early 1990s, during this time of family and business turmoil. Rosenberg negotiated with James and John on Peter's behalf in an attempt to keep the peace among the brothers and eventually dissuaded James and John from pursuing criminal charges against Peter.[3] *Id.* at 40, 50–51.

## III. The Gruntal Litigation

While Rosenberg was successful in discouraging Peter's brothers from contacting the District Attorney's Office, his efforts did not prevent a civil suit. James and John subsequently filed a lawsuit against Peter as well as, among others, Gruntal & Co. ("Gruntal") and Maurice (Mike) Gross, who were the brokers involved in Peter's option trades (the "Gruntal litigation"). On June 18, 1993, the action was dismissed against all defendants except Peter. *Id.* at 73.

### A. August 1993 Agreement

Soon afterwards, John and Peter signed an agreement in August 1993 ("August 1993 Agreement") in which Peter assigned and transferred to John his right, title, and interest in all the family businesses. Pl. Ex. 41. In addition, Peter assigned to John two-thirds of the amount of any recovery he received from his cross-claims against the brokers.[4] Trial Tr. 69, 74–75, 190; Pl.Ex. 41. Peter was subsequently dismissed from the Gruntal litigation by stipulation on April 11, 1994.[5] Trial Tr. 76.

### B. Rosenberg's Knowledge

Although Rosenberg never formally appeared in the Gruntal litigation, he was retained by Peter and also communicated with Vito Vincenti, Esq. (counsel for James and John) on Peter's behalf on numerous occasions. *See, e.g.,* Pl.Ex. 21, 22, 26, 30, 31, 33, 37; Trial Tr. 198, 202, 418–23; Pl.2d Req. to Admit ¶ 30. During the course of his representation of Peter, Rosenberg learned (if he did not already know of them) many of the details of Peter's misdeeds, which would later be the focus of much of the litigation before this Court.

#### 1. August 1993 Agreement

Significantly, Vincenti testified at trial in this litigation, and his records reflect, that Rosenberg was involved in the negotiations which led to the drafting of the August 1993 Agreement. Pursuant to phone conversations with Rosenberg, Vincenti drafted an agreement designed to constitute a binding contract. Pl.Ex. 19; Trial Tr. 192, 209–10. Similar to the final August 1993 Agreement, this draft effectuated the sale of Peter's rights and interests in the family businesses (including 27 Whitehall Street Group) to James and John.[6] Pl.Ex. 27; Pl.2d Req. to Admit ¶ 25. On August 13, 1993, Vincenti sent a substantially similar draft of the agreement to Oscar Goldberg, Esq., an attorney who often represented the family in real estate matters, and a copy of this draft eventually

---

nership interests after 1993. However, due to a clerical mistake, Peter was inadvertently included as a partner in the partnership's tax returns from 1994 to 1997. Trial Tr. 129; Pl.Ex. 84 at 97–150.

**3.** Rosenberg also represented Peter Costalas in the various foreclosure proceedings which ensued. Trial Tr. 41.

**4.** Rosenberg was to receive the other third.

**5.** This chronology of events is consistent with plaintiffs' assertion that the August 1993 Agreement prompted the eventual discontinuance of the Gruntal litigation against Peter. *Id.* at 224.

**6.** A copy of the draft was faxed to Rosenberg on March 16, 1993. After Rosenberg received this draft, Vincenti and Rosenberg engaged in a phone conversation, following which Vincenti sent a revised agreement to Rosenberg on March 17, 1993. Pl.Ex. 28, 29.

was signed by Peter and John.[7] Trial Tr. 102; Pl.Ex. 40, 41.

Rosenberg ultimately was "instrumental" in negotiating a settlement of Peter's cross-claim against Gruntal, which involved a payment of $200,000. Rosenberg retained one-third of the payment as his fee. *Id.* at 357. The remaining two-thirds were divided equally into two checks, both made out to Peter.[8] *Id.* at 359; Pl.Ex. 56, 57.

## 2. Peter's Trading

The Gruntal litigation provided Rosenberg an opportunity to learn details of Peter's option trading. Significantly, Rosenberg requested and eventually received from David Brodsky, Esq. (counsel for defendants Gruntal and Gross in the Gruntal litigation) trading account records of both Peter's parents and an employee of the family business because Rosenberg represented that those accounts were "totally intertwined with those of Peter Costalas."[9] Pl.Ex. 34; Trial Tr. 383, 394–98. These statements detail numerous transactions involving call option and put option orders.[10] Pl.Ex. 49; Trial Tr. 406–08.

Despite the fact that they resided in Greece, the addresses listed for Peter's parents on the statements at various points were a post office box maintained by Peter and Peter's own home address during that time, which was then known by Rosenberg. Trial Tr. 409, 427. Even if Rosenberg previously had any doubts, these documents confirmed that Peter had been engaged in wrongdoing during the course of his option trading.

## IV. The Costalas Litigation

In 1993, at the family's request Mrs. Amalfitano (James' daughter), a Villanova University graduate who had majored in business and communications, began to assume responsibility for the operation and management of the Costalas family businesses, of which only one restaurant and a building at 27 Whitehall Street remained. *Id.* at 30, 35. At that time, the building at 27 Whitehall Street[11] was subject to a two million dollar mortgage ($800,000 of which had been undertaken by Peter without his brothers' knowledge). *Id.* at 38, 48. Mrs.

7. It is not clear whether Rosenberg received a contemporaneous copy of the August 1993 Agreement (though Rosenberg's files did contain a copy of the August 1993 Agreement which had been signed only by Peter). Trial Tr. 307–09.

8. It should be noted that Mrs. Amalfitano picked up a check for a portion of this amount directly from Rosenberg's office, on behalf of James and John. These actions are consistent with the terms of the August 1993 Agreement and constitute further evidence that Rosenberg was fully aware of its binding nature. *Id.* at 77–78; 358–63.

9. Rosenberg admitted to knowing no later than August 12, 2003 that Peter had forged the signatures of various family members while engaging in his option trades. *Id.* at 58, 62, 65. This testimony, coupled with other evidence, contradicts his later assertion at trial that, aside from the allegations made by Mrs. Amalfitano and others, he had "no personal knowledge" of the fact that Peter had

forged the signatures of his parents and brothers on account statement applications. *Id.* at 392.

10. Rosenberg claimed at trial that he was wholly unable to interpret these statements. *Id.* at 407. Regardless of whether Rosenberg could have interpreted the statements fully, surely he should have questioned how so many trades of such a nature could be made by Peter's parents, one of whom could only make a mark in place of a signature.

11. The building was formally owned by the 27 Whitehall Street Group, which was a partnership formed on December 16, 1980 by Peter, James, and John. *See Costalas v. Amalfitano,* 305 A.D.2d 202, 202, 760 N.Y.S.2d 422, 423 (1st Dep't 2003). At the time of the purchase, John and James were the sole partners following Peter's expulsion pursuant to the August 1993 Agreement. *Id.* at 202.

Amalfitano eventually purchased the building in 2000 in order to avoid foreclosure. As part of this purchase, the contract of sale was assigned to Mrs. Amalfitano's corporation, MSA Twins, Ltd., Mrs. Amalfitano personally guaranteed the necessary mortgage loan, and James and John were released from their obligations on the mortgage.[12] *Id.* at 80, 83, 91, 93, 94.

The next year, on May 18, 2001, Rosenberg, as Peter's attorney,[13] initiated a lawsuit (the "Costalas litigation") against the Amalfitanos. *Id.* at 97. Despite Rosenberg's knowledge of recent events, he filed a complaint alleging both that the Amalfitanos defrauded James and John into conveying 27 Whitehall Street to the Amalfitanos and that Peter was still a partner in the business.[14] Relying on an asserted difference between the purchase price and the total value of the property, the complaint alleged essentially that the Amalfitanos had fraudulently purchased the property under extremely favorable terms. Ironically, the complaint also asserted a claim under § 487 against Mr. Amalfitano.[15] Excluding the claim under § 487, the complaint filed by Rosenberg sought $4,185,000 in damages.[16]

## 1. Motion to Dismiss

On July 31, 2001, the Amalfitanos moved to dismiss the suit, alleging that Peter lacked any interest in the contested property because he had transferred his interest to his brothers in the August 1993 Agreement. *Id.* at 99. In response, Rosenberg made a cross-motion for summary judgment on August 28, 2001. *Id.* at 127.

In support of his cross-motion, Rosenberg prepared and notarized a sworn affidavit by Peter which claimed, among other things, that the August 1993 Agreement "never intended and did not ever take any effect" because Peter's previous attorney, Oscar Goldberg, had advised him to sign the agreement only as a sham to avoid potential creditors. Pl.Ex. 84 at 63–65; Pl. Prop. Find. of Fact and Concl. of Law ¶ 21.

Despite Rosenberg's concession during trial in this litigation, that if the August 1993 Agreement was valid that there would have been no basis for the instigation of the Costalas lawsuit, *see* Trial Tr. 250, he acknowledged at trial in this litigation that he took no steps to investigate the circumstances behind the signing of the August 1993 Agreement. Rosenberg admitted that he made no attempt to contact Goldberg, but merely relied upon Peter's account of the circumstances.[17] *Id.* at

---

**12.** As part of this transaction John and James also signed affidavits stating that they were the only partners of 27 Whitehall Street Group. Trial Tr. 81.

**13.** We note that Rosenberg was retained by Peter on a contingent basis. *Id.* at 327.

**14.** Rosenberg never provided any plausible explanation for why, if there was a factual basis for his complaint, he did not attempt either to represent James and John in this action or to name them as co-defendants. *See, e.g., id.* at 327. Of course, in light of actual events, his failure to pursue either course was understandable. The former was impossible, given the breach between James and John and Peter, and the latter would have exposed Peter to counterclaims for amounts far in excess of his own claims (as even under his own, false theory, Peter at most would have been entitled to a share of one-third of the value of the mortgage).

**15.** Both the trial court and the Appellate Division rejected this claim, and it is clear that Rosenberg had no legal basis for its assertion. *Id.* at 478–79.

**16.** Rosenberg's testimony at trial confirmed that this request for damages had no rational basis. *Id.* at 456–65. In any event, Rosenberg did not account either for the assumption of the mortgage or the benefits from keeping the property in the family.

**17.** While defendant apparently spoke with Goldberg well before the Costalas litigation began, he did not contact him or attempt to have him testify in connection with the Costalas litigation. *Id.* at 296–97.

247, 250–55. Rather, Rosenberg limited his efforts to performing a title search of 27 Whitehall Street and comparing the sale price to the market value of the property.[18] *Id.* at 277.

On October 25, 2001, the trial judge, Judge Ira Gammerman, granted the Amalfitanos' motion to dismiss on default. Pl. Ex. 84 at 176–5. Rosenberg subsequently moved to vacate this default on December 20, 2001, and this motion was denied by Judge Gammerman on May 3, 2002. Trial Tr. 215; Pl.Ex. 82. Though Judge Gammerman noted that the default itself was excusable, he declined to vacate the default because he found that the litigation was without merit in that Peter was estopped by the parol evidence rule from arguing

that the August 1993 Agreement was a sham and therefore not effective.[19]

## 2. First Appeal

Following denial of his motion to vacate the default judgment, Rosenberg filed a Notice of Appeal on May 31, 2002, in the Appellate Division, First Department.[20] Trial Tr. 106. On May 13, 2003, the Appellate Division held that the motion to vacate the default judgment should have been granted, noting that Rosenberg's explanation for his failure to appear was reasonable and that, aside from his § 487 claim against Mr. Amalfitano, "plaintiff's submissions sufficed to make the requisite prima facie showing of merit." *Costalas,* 305 A.D.2d at 203, 760 N.Y.S.2d at 424.

---

**18.** Rosenberg's failure to contact Goldberg before filing suit is consistent with the act of someone who knew that the August 1993 Agreement was valid. Any further investigation was futile because it would only have confirmed what he already knew to be true or might have created an ethical conflict.

**19.** Judge Gammerman also held that Peter lacked standing to maintain the action.

**20.** Rosenberg also admitted during his testimony that he filed a false certification with the Record on Appeal. *Id.* at 334.

Q. Well, why don't you look [at] the page before when you certified the record.
A. November 4.
Q. That's your signature?
A. I guess so.
Q. So the record on appeal—well, is it your signature?
A. I guess so.
Q. Did you have somebody else sign the certification for you, Mr. Rosenberg?
A. I think I signed it, if not the printer did, but it's a correct record.
Q. Mr. Rosenberg, isn't it a requirement on an appeal that the attorney personally certify that he or she reviewed the records. . . .
A. Well, the rule says [the] foregoing, so forth, right.
Q. Doesn't this certification say that in fact you did that?

A. Well, I am fully—I was and am fully familiar with every document that was certified to that is in this record on appeal.
COURT: But you didn't sign this; right? This is not your signature on page 226; is .it?
Q. Did you answer the question? I didn't hear it.
A. It may be the printer's signature.
COURT: The question is simply: It's not your signature, it's somebody else's; correct?
THE WITNESS: It would appear so, yes, your Honor.
THE COURT: Do you have any doubt about that, Mr. Rosenberg, whether this is your signature or not?
THE WITNESS: No.
THE COURT: The same is true on page 225; is it not? That is not your signature?
THE WITNESS: Excuse me. Yes.
BY MR. HAHN:
Q. Mr. Rosenberg, isn't it true, looking back on page 226, your certification that you personally reviewed the file in the county clerk's office and compared it with this document, that is a false certification because you didn't go down to the county clerk's office; did you?
A. That is correct.
*Id.* at 334–35.

The court also discussed the August 1993 Agreement, holding that:

> [T]he motion court erred in holding as a matter of law that plaintiff must be estopped from claiming that the assignment agreement was never intended as a valid agreement. *Serious open questions remain as to the real need for and purpose of the purported assignment,* and for whose benefit it was intended. Before the court can properly conclude that plaintiff executed a sham agreement in order to defraud creditors, and therefore will be estopped from relying upon the exception to the parol evidence rule for documents which were never intended to be contracts . . . *there should be an evidentiary exploration of the circumstances surrounding the purported assignment.*

*Id.* at 203, 424, 760 N.Y.S.2d 422 (emphasis added).

The Appellate Division affirmed the dismissal of Peter's § 487 claim against Gerard Amalfitano, holding that § 487 was inapplicable to misconduct not directed at a court or occurring during the course of a pending judicial proceeding. *See Costalas,* 305 A.D.2d at 204, 760 N.Y.S.2d at 424.

**21.** Indeed, Rosenberg does not even recall whether he read the letter from the Amalfitanos' counsel citing authority for the proposition that there is no accountant client privilege. The privilege exception for communications to an accountant hired by counsel set forth in *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961), has no relevance here and Rosenberg does not argue otherwise. Pl.Ex. 101; Trial Tr. 490–93.

**22.** Due to Rosenberg's erroneous advice to Komendant, the Amalfitanos were forced to incur an additional one thousand dollars to cover the expense of the presence of Komendant's attorney at the deposition.

> Q. And did that dispute result in your incurring any expense?
> A. Absolutely.

### 3. Pre–Trial Discovery

Following the Appellate Division's decision, the parties in the case proceeded with pre-trial discovery, during which Rosenberg engaged in a persistent pattern of unethical behavior. For instance, upon receiving notice that the Amalfitanos planned to depose Howard Komendant, who served for a time as the accountant for the family businesses, Rosenberg tried to discourage his testimony by sending him a letter on August 25, 2003; stating that "[y]ou should be advised that, in my opinion, if, in fact, you served in a professional capacity, all communications, contacts and documents were of a privileged nature." Pl.Ex. 100; Trial Tr. 487–90. Rosenberg was unable to cite any legal support for this advice, and he took no action upon subsequently being informed by Hahn that this position had no basis.[21] Notably, Rosenberg chose not to even attend Komendant's deposition or to make any kind of application to the court on this issue.[22] Trial Tr. 493.

Rosenberg also failed to correct deposition testimony given by Peter on July 15, 2003, which Rosenberg knew at the time to be false. Specifically, Rosenberg knew that Peter had falsely testified when he stated that James and John had never brought a suit against Gruntal and other entities.[23]

> Q. And what was the expense you had to incur?
> A. $1,000.
> Q. And what was that for?
> A. For Howard Komendant's attorney to have to escort him and be next to him during his testimony.
> Trial Tr. 56.

**23.** During Rosenberg's testimony in this Court, he testified:

> A . . . . well, the first answer that was there was no Gruntal litigation, period. That was his first response until he was shown the complaint. Then he testified he had never seen the Gruntal complaint.
> Q. And you knew that was false, didn't you?
> THE COURT: And knew it was false when he said that he never signed any docu-

*Id.* at 365–66. Similarly, Rosenberg also did not respond in any way to Peter's false testimony that he had never signed any documents during the Gruntal litigation.[24] *Id.* at 376–82. Finally, Rosenberg failed to correct Peter's testimony that, in regard to his trading of stock options, he had only sold "maybe five, ten, here and there," despite the fact that Rosenberg had earlier reviewed account statements which directly contradicted this statement. *Id.* at 425, 436–38, 440; Pl.Ex. 148.

Rosenberg also rejected an initial request by Richard Hahn, Esq.[25] for the production of Peter's personal tax returns, stating that they were "totally irrelevant."[26] Trial Tr. 514–17; Pl.Ex. 89. Rosenberg eventually produced returns for the years 1995–2002 only after being ordered to do so by Judge Gammerman, and they were ultimately admitted into evidence at trial. Pl.Ex. 91, 92; Trial Tr. 531. Significantly, none of these returns listed a partnership interest in 27 Whitehall Street Group. Pl.Ex. 92; Trial Tr. 520–22. Given that tax returns should reflect partnership interests, the claim that they were "irrelevant" cannot withstand even the most minimal scrutiny. Obviously, the fact that they fundamentally contradicted the premise of his case was the motivating factor for Rosenberg's reluctance to produce the tax returns.

During discovery, Rosenberg informed the Amalfitanos that he possessed an "atomic bomb" with which he would hit the parties and that he had audio recordings which would be damaging to the Amalfitanos. Trial Tr. 150. Hahn initially requested the production of these recordings during Peter's July 15, 2003, deposition and followed this with a second request on July 29, 2003. *Id.* at 496–97; Pl.Ex. 152. Rosenberg did not produce them, but instead claimed in an August 28, 2003, letter to Hahn that the recordings contained material of a "grossly detrimental" nature to the Amalfitanos.[27] Pl.Ex. 153; Trial Tr. 151–52, 496–99. Rosenberg ultimately produced the recordings only after being ordered to do so by Judge Gammerman. Pl.Ex. 155; Trial Tr. 502–03. When the Amalfitanos were finally able to play the recordings, they proved to be unintelligible. Indeed, no further mention of them was ever made by Rosenberg.[28] Trial Tr. 152, 154.

---

ments in connection with the lawsuit, because he signed the extensions of time to answer and he wrote on those pieces of paper I acknowledge that I received the summons and complaint in this case.
THE WITNESS: That's correct.
THE COURT: You knew that, so when he's saying this, regardless of why he's saying this, you knew that it was not so.
THE WITNESS: [T]hat's why I said what I did when I said hold it and so forth.
*Id.* at 366–67.

24. The evidence shows that Rosenberg was well aware of details surrounding the Gruntal litigation at the time, as his own notes indicate that prior to the commencement of the Costalas litigation he had decided to "chek [sic] Gruntal file." Pl.Ex. 72; Trial Tr. 315. Rosenberg now denies any recollection of keeping a Gruntal file, and at one point testified at trial that "I have no recollection that I ever had any litigation or anything of the sort with Gruntal." Trial Tr. 315.

25. Mr. Hahn represented the Amalfitanos throughout most of the Costalas litigation and all of the current litigation.

26. Rosenberg's explanation that he had not requested that Peter produce his personal tax returns from either before or after 1993 before he commenced the Costalas litigation because any such documents would be "self-serving" rings hollow. *Id.* at 510, 512.

27. At trial in this litigation, Rosenberg admitted that he had not yet even listened to the recordings when he wrote this letter to Hahn, nor had he listened to them by the time he eventually produced them to Hahn. *Id.* at 500, 503.

28. Rosenberg also made no attempt to use the recordings during the Costalas trial. *Id.* at 154.

### 4. The Costalas Trial

Rosenberg continued to engage in professionally questionable conduct throughout the Costalas trial. During the trial, the August 1993 Agreement was admitted into evidence to establish Peter's expulsion from the family businesses. Subsequently, however, Rosenberg unsuccessfully sought to introduce into evidence an agreement ("October 1993 Agreement"),[29] given to him by Peter, which was witnessed by Oscar Goldberg and signed by Peter on October 29, 1993.[30] *Id.* at 153, 259; Pl.Ex. 84 at 151. The October 1993 Agreement directly contradicted the August 1993 Agreement and stated in part that "Peter, James and John are equal partners of various partnerships, including, but not limited to 27 Whitehall Street Group." Pl.

Ex. 84 at 151. Rosenberg attempted to use this document even though he knew that the August 1993 Agreement was valid and had been signed by his client following a litigation and controversy which revealed a more than ample basis for the forfeiture by Peter of his partnership interest.

In addition, some time after Peter's personal tax returns with IRS receipt stamps had been admitted into evidence, Rosenberg attempted to admit a different tax return for 1998 while conducting his re-direct examination of Peter. This version, unlike the one previously produced and admitted, listed a partnership interest in 27 Whitehall Street Group.[31] Despite the fact that this subsequent version, unlike the earlier one admitted, bore no stamp indicating that it had ever been filed with the IRS and directly contradicted the returns he had produced during discovery,

29. We note that Rosenberg also included a copy of this agreement in the Record on Appeal which accompanied his first appeal of the Costalas litigation. Pl.Ex. 84 at 151.

30. As reflected in the trial transcript of the Costalas litigation:

> The Court: This is an agreement dated October 29, '93....
> Mr. Rosenberg: It's already in the record.
> The Court: The objection is sustained....
> Mr. Rosenberg: Your Honor, I wish to point out—
> The Court: Counsel, you are not going to point anything out. It's not in evidence. Please.... You can't get this in, counselor. It's not signed by anybody but your client. No, no. The objection is sustained. Let's move on....
> Mr. Rosenberg: Oscar Goldberg notarized.
> The Court: I don't care if it is notarized or not.

Pl.Ex. 110 at 136–38.

Rosenberg testified that he never made any efforts (by contacting Goldberg, for instance) to verify the validity of the October 1993 Agreement. Trial Tr. 262. We also note that Rosenberg himself had every reason to know that he would not be able to use such an agreement at trial, in light of the fact that it was signed only by Peter. As Rosenberg him-

self testified later regarding a different issue, "we learned in law school, to bind an adversary, it would have to be—the document would have to be signed by the adversary." *Id.* at 511.

31. As reflected in the trial transcript of the Costalas litigation:

> Q. I show you what appears to be your Federal tax return for the year '98 with a covering letter from the CPA.
> THE COURT: '98?
> MR. ROSENBERG: That's right....
> THE COURT: It's in evidence, counselor.
> MR. ROSENBERG: His personal return.
> THE COURT: Yes, his personal returns are in evidence.... They are all in evidence.
> MR. ROSENBERG: I'm not sure whether the one you have still shows him to be a partner which is a point he tried to make.
> THE COURT: The returns that we have show[] no partnership at all.
> MR. ROSENBERG: This one does....
> THE COURT: Just a second. Was this produced during discovery?
> MR. HAHN: No, it was not. I've never seen it before.
> THE COURT: It's not going into evidence....

Pl.Ex. 109; 110 at 133.

Rosenberg still sought to admit it because "somebody handed it to me."[32] Trial Tr. 536.

### 5. Subsequent Appeal

After Rosenberg rested Peter's case on October 17, 2003, the Amalfitanos again moved to dismiss, which motion Judge Gammerman granted from the bench based on Peter's failure of proof. Trial Tr. 130. A judgment of dismissal was then entered on November 3, 2003. Pl.Ex. 112. On November 5, 2004, after the current action by the Amalfitanos against Rosenberg was filed, Rosenberg moved to vacate the dismissal of the Costalas litigation based on entries found in Hahn's time records which purportedly revealed *ex parte* communications with Judge Gammerman. Pl.Ex. 117. After this motion was denied on January 27, 2005 as "baseless and without merit," Pl.Ex. 126, Rosenberg appealed. The order denying the motion to vacate the dismissal was unanimously affirmed by the Appellate Division on November 22, 2005. *See Costalas v. Amalfitano*, 23 A.D.3d 303, 808 N.Y.S.2d 24 (1st Dep't 2005).

## V. The Current Lawsuit

On March 16, 2004, the Amalfitanos filed the present action, which alleges that Rosenberg engaged in conduct throughout the Costalas litigation in violation of § 487. This conduct allegedly required the Amalfitanos to incur legal expenses of $95,861.78,[33] which, in addition to interest, they now seek to treble under § 487.

Plaintiffs filed a motion *in limine* on March 16, 2005, requesting a finding that Rosenberg was in privity with Peter for *res judicata* and collateral estoppel purposes, which we denied.[34] *See Amalfitano v. Rosenberg*, No. 04 Civ.2027(NRB), 2005 WL 2030313 (S.D.N.Y. Aug.22, 2005). Upon completion of discovery, a four-day bench trial commenced on November 15, 2005, during which Rosenberg called no witnesses. Plaintiffs called Vivia Amalfitano, Gerard Amalfitano, Vito Vincente, and the defendant and relied heavily on extensive admissions in response to notices to admit served by plaintiffs upon defendant. At the conclusion of trial, plaintiffs moved for partial judgment on the issue of liability pursuant to Fed.R.Civ.P. 52(c) as well as for an order directing an examination of Rosenberg's assets and restraining him from transferring or dissipating such assets pending entry of judgment.[35]

---

**32.** Rosenberg could offer no reasonable explanation for why he attempted to admit it into evidence.

Q. Why were you offering this document in evidence, Mr. Rosenberg?
A. Because somebody handed it to me; probably Peter....
THE COURT: But you knew it wasn't the one that was filed, because you had a file stamp on the other 1998 tax return; right?
THE WITNESS: Well, your Honor—
THE COURT: Yes or no.
A. I used it because it was handed to me.
Trial Tr. 536.

**33.** Plaintiffs filed a First Notice of Intent to Increase *Ad Damnum* on March 8, 2005, in which they stated that they would move this Court to increase the *ad damnum* clause by $1,850 (plus interest, and then trebled) for charges incurred from November 2004

through February 2005 in responding to Rosenberg's motion to vacate the judgment. Plaintiffs made no such motion, but for reasons discussed below, this does not affect our assessment of damages.

**34.** Plaintiffs sought an order finding that Rosenberg was in privity with Peter for purposes of invoking *res judicata* and collateral estoppel as to issues raised in the Costalas litigation. We denied the motion because we did not believe there were sufficient facts presented at the time upon which to make such a finding.

**35.** Defendant filed no opposition to plaintiffs' motion and request for a restraining order. Given defendant's agreement not to transfer his assets, the motion for partial judgment on liability was mooted.

## DISCUSSION

As stated above, plaintiffs' claim is based on § 487, which states that an attorney who

> [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Jud. Law § 487 (McKinney 2005). This law "supports a civil action by a party to a litigation against the attorneys representing parties in the litigation, for any deceit or collusion practiced within New York's territorial borders on either the court or 'any' party, and provides for· a treble damage award in such an action." *Trepel v. Dippold*, No. 04 Civ. 8310(DLC), 2005 WL 1107010, at *4 (S.D.N.Y. May 9, 2005) (citing *Schertenleib v. Traum*, 589 F.2d 1156, 1166 (2d Cir.1978)).

█ Although cases frequently cite a requirement that the defendant attorney "engaged in a chronic, extreme pattern of legal delinquency," *Schindler v. Issler & Schrage, P.C.*, 262 A.D.2d 226, 226, 692 N.Y.S.2d 361, 362 (1st Dep't 1999) (citations omitted), no such requirement is imposed by the statute itself. Rather, "[a] single act or decision, if sufficiently egregious and accompanied by an intent to deceive, is sufficient to support liability." [36] *Trepel*, 2005 WL 1107010, at *4; *see Izko Sportswear Co. v. Flaum*, 20 A.D.3d 392, 395, 798 N.Y.S.2d 136, 138 (2d Dep't 2005), *reh'g granted*, 25 A.D.3d 534, 809 N.Y.S.2d

119; *but see Solow Mgmt. Corp. v.· Seltzer*, 18 A.D.3d 399, 399–400, 795 N.Y.S.2d 448, 448 (1st Dep't 2005). Intentionally withholding information may also constitute an act of deception. *See Schindler*, 262 A.D.2d at 229, 692 N.Y.S.2d at 363 (finding liability under § 487 where defendant "knowingly withheld crucial information" from the court). In addition, in order to successfully maintain a claim under § 487, it is essential to establish damages caused by the deceit. *See Feldman v. Jasne*, 294 A.D.2d 307, 742 N.Y.S.2d 540 (1st Dep't 2002); *Brown v. Samalin & Bock, P.C.*, 155 A.D.2d 407, 408, 547 N.Y.S.2d 80, 80 (2d Dep't 1989); *see also Cresswell v. Sullivan & Cromwell*, 771 F.Supp. 580, 587–88 (S.D.N.Y.1991); *Nobile v. Schwartz*, No. 99 Civ. 2375(RWS), 2000 WL 1753036, at *9 (S.D.N.Y. Nov.29, 2000).

As recounted above, the evidence elicited at trial details a litany of misconduct by Rosenberg.[37] To summarize, Rosenberg acted unprofessionally and/or unethically by: (i) signing Peter's verified complaint, which he knew contained the false allegation· that Peter was still a partner in 27 Whitehall Street Group; (ii) pleading a § 487 claim against Mr. Amalfitano without any legal basis; (iii) pleading a claim for damages which had no rational basis; (iv) making a cross-motion for summary judgment based upon false allegations and supported by an affidavit falsely claiming that the August 1993 Agreement was not valid; (v) renewing the same, fraudulent arguments on appeal and attaching a copy of an October 1993 Agreement, which he

---

**36.** Even if this standard were rejected by the New York Court of Appeals, the evidence elicited at trial establishes that Rosenberg's behavior during the course of the Costalas litigation constitutes a sufficiently "chronic, extreme pattern of legal delinquency" such that he would be liable under § 487. *See Izko Sportswear*, 20 A.D.3d at 395, 798 N.Y.S.2d at 138.

**37.** We also note that based upon this Court's observation of Rosenberg's testimony during trial, it is clear that his frequently claimed failures of memory. were not attributable to dementia or senility. Rather, Rosenberg made every effort to intentionally evade questions posed to him by plaintiffs' counsel.

knew to be fraudulent, in support thereof; (vi) failing to personally certify the Record on Appeal; (vii) advising Komendant that his testimony necessarily would be privileged and never withdrawing that baseless advice; (viii) failing to correct materially untrue testimony given by Peter at his July 15, 2003 deposition; (ix) refusing, until compelled, to produce Peter's personal tax returns which directly contradicted a central allegation of the complaint; (x) failing to turn over audio recordings in a timely fashion after misrepresenting their contents; and (xi) seeking to admit into evidence the October 1993 Agreement and a fraudulent 1998 tax return.

Most, if not all, of these actions would constitute sanctionable conduct under the Rules of the Chief Administrator of the Courts of the State of New York governing "Awards of Costs and Imposition of Financial Sanctions for Frivolous Conduct in Civil Litigation," §§ 130–1.1—130–1.5. We are mindful, though, that not all unethical or sanctionable conduct necessarily violates § 487. However, applying the aforementioned standards, and as further explained below, we find that some of these actions do subject Rosenberg to liability under § 487. At the very least, those actions undertaken by Rosenberg which directly conflicted with his knowledge of the validity of the August 1993 Agreement constitute violations of § 487.

## I. Intent

■ If Rosenberg's representation of Peter had commenced with the filing of the Costalas litigation, Rosenberg's actions might demonstrate a lack of competence, common sense, or rationality. However, in light of the knowledge he gained in the course of both his prior representation of Peter during the Gruntal litigation and his involvement in disputes within the Costalas family, we have no hesitancy in concluding that Rosenberg's actions evince a deliberate intent to deceive both the Supreme Court and the Appellate Division during the Costalas litigation.

From the outset, Rosenberg filed a complaint alleging, in part, that Peter was still a partner in 27 Whitehall Street Group, despite the fact that he knew that Peter's partnership interest had earlier been terminated by the August 1993 Agreement as a direct consequence of Peter's theft from the family businesses of millions of dollars. Rosenberg was intimately involved in the negotiations which led to the drafting of the agreement. In addition, Rosenberg previously had acted in accordance with the terms of the agreement by dividing the settlement amount received from the Gruntal litigation between his own fees and portions allocated to James and John.

However, Rosenberg not only made this false allegation in the complaint, but he repeated it in both his cross-motion for summary judgment and in his initial appeal before the Appellate Division. Specifically, Rosenberg submitted an affidavit by Peter which contained the false statements that the August 1993 Agreement had been intended as a sham. He again submitted this affidavit as well as a copy of the October 1993 Agreement in support of his appeal. Rosenberg knew that the August 1993 Agreement was valid and therefore knew that the October 1993 Agreement was fraudulent. Despite his first-hand knowledge of the execution of the August 1993 Agreement, he nevertheless proceeded to rely on the October 1993 Agreement without making any effort to confirm its validity with Oscar Goldberg or to call Goldberg to testify during the Costalas litigation, as both steps would have been futile. Rosenberg's knowledge is well documented; his failure to take the additional steps, which could have supported his position if it had any merit, can readily be characterized as willful blindness.

Finally, during the Costalas trial, Rosenberg sought to admit both the October 1993 Agreement and a false 1998 tax return into evidence. In addition to knowing that the October 1993 Agreement was not valid, Rosenberg knew that the 1998 tax return was fraudulent because it directly contradicted tax returns he had earlier produced which bore an IRS receipt stamp (and which he knew to be accurate given his familiarity with recent events involving Peter's expulsion from the family business). Therefore, in light of the knowledge he possessed from his earlier involvement with the family, the conclusion is inescapable that Rosenberg's actions demonstrated a knowing intent on his part to deceive both the Supreme Court and the Appellate Division.

## II. Success

■ Rosenberg argues that actual success in deceiving the court is required under § 487. Thus, he argues, even if he intended to deceive the court, he is not liable under § 487 because his attempts to do so ultimately were unsuccessful. Rosenberg's argument appears to raise a novel question, which has not yet squarely been addressed by New York courts.

Though defendant has construed some opinions to support the requirement of actual success, none of these cases directly addressed the issue nor in fact based their decisions on any such requirement.[38] *See Chiarello v. Harold Sylvan, P.C.,* 161 A.D.2d 948, 951, 557 N.Y.S.2d 517, 519 (3d Dep't 1990) (noting that § 487 claim was rightly dismissed "for no deception was shown to have occurred" where the Court held that there was no intent to deceive or damages suffered); *O'Connor v. Dime Sav. Bank of New York, F.S.B.,* 265 A.D.2d

313, 314, 696 N.Y.S.2d 477, 478 (2d Dep't 1999) (stating that cause of action under § 487 must fail because plaintiff could not establish that he was deceived or that he suffered damages caused by the deceit); *see also Schweizer v. Mulvehill,* 93 F.Supp.2d 376, 408 (S.D.N.Y.2000) (noting that "a plaintiff must plead and prove ... actual deceit by the attorney" but relying on lack of damages in finding no violation of § 487).

Thus, no court has in fact held that actual success is required. Moreover, we reject Rosenberg's argument for two additional reasons.

### A. Rosenberg's Successful Deceit

Contrary to defendant's argument, Rosenberg actually succeeded in deceiving the Appellate Division. In concluding that the default judgment should have been vacated, the court held that the submissions filed by Rosenberg were sufficient to make a prima facie showing of merit. *See Costalas,* 305 A.D.2d at 203, 760 N.Y.S.2d at 424. In addition, the court noted that there were still issues regarding the validity of the August 1993 Agreement. Clearly, these conclusions were a direct result of Rosenberg's false allegations that Peter was still a partner in 27 Whitehall Street Group, and the fraudulent documents submitted in support thereof.

### B. Interpretation of Judiciary Law § 487

However, even if we assumed that Rosenberg was unsuccessful in deceiving Judge Gammerman or the Appellate Division, we hold that he would still be liable under § 487. Given the lack of a definitive pronouncement on this issue, our role is

---

**38.** To the extent that any intermediate state courts might be construed to have endorsed such a requirement, we note that we would not be bound by any of these holdings but

must rather focus on predicting what the New York Court of Appeals would hold. *Michalski v. Home Depot, Inc.,* 225 F.3d 113, 116–17 (2d Cir.2000).

"carefully to predict how the highest court of [New York] would resolve the uncertainty or ambiguity." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 199 (2d Cir.2003); *see State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 505 (2d Cir.2004); *Michalski*, 225 F.3d at 116. To aid us in this process, we must examine available resources, including:

> the statutory language, pertinent legislative history, the statutory scheme set in historical context, how the statute can be woven into the state law with the least distortion of the total fabric, state decisional law, federal cases which construe the state statute, scholarly works and any other reliable data tending to indicate how the New York Court of Appeals would resolve the [issue].

*Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994) (citation omitted).

Rosenberg argues that § 487 is best understood within the framework of the law of torts and particularly that of fraud, which requires actual success for liability. Accordingly, he argues, liability under § 487 requires actual success as well. However, both the language of the statute and the statute's historical context suggest otherwise.

### 1. Historical Context

Significantly, § 487 is derived nearly verbatim from § 273 of the Penal Law of 1909,[39] which eventually was transposed into the Judiciary Law by Chapter 1031 of the laws of 1965, effective September 1, 1967. *See* N.Y. Jud. Law § 487 (McKinney 2005); *Cox v. Microsoft Corp.*, 290 A.D.2d 206, 207, 737 N.Y.S.2d 1, 3 (1st Dep't 2002) (noting that "the penalty for attorney misconduct found in Judiciary Law § 487 is derived from former Penal Law § 273"); *Trepel*, 2005 WL 1107010, at *4. Therefore, the historical placement of § 487 within the penal law supports the argument that the more appropriate context for analysis is not the law applicable to comparable civil torts but rather criminal law, where an attempt to commit an underlying offense is punishable as well the underlying offense itself.

### 2. Statutory Text

"It is axiomatic that [t]he starting point in every case involving construction of a statute is the language itself." *Samuels, Kramer & Co. v. Comm'r of Internal Revenue*, 930 F.2d 975, 979 (2d Cir.1991) (internal quotations and citation omitted). In this case, the language of the statute is highly instructive. The statute reads in relevant part that an attorney who "[i]s guilty of any deceit ... or consents to any deceit ... with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and *in addition to* the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."[40] N.Y. Jud. Law § 487 (McKinney 2005) (emphasis added). The wording of the statute thus makes it clear that the civil

---

**39.** Prior to their inclusion in § 273, the provisions appeared in § 148 of the Penal Code of 1881 and before that, in §§ 69 and 70 of The Revised Statutes of New York (1836).

**40.** As a general matter, definitions of "deceit" include:

> 1. The act of intentionally giving a false impression.... 2. A false statement of fact made by a person knowingly or recklessly (i.e., not caring whether it is true or false) with the intent that someone else will act upon it.... 3. A tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it.

*Black's Law Dictionary* (8th ed.2004). While the first and third definitions would seem to require success, the statute does not explicitly delineate which, if any, of these definitions applies here.

remedy is in addition to the criminal sanction for the same conduct. Equally clear is that, as a general matter, attempted crimes are punishable under New York penal law. *See* N.Y. Penal Law § 110.00 (McKinney 2004) ("A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."). Therefore, under a plain reading of the statute, an attempted act of deceit, though unsuccessful, would merit both criminal punishment and civil liability. Accordingly, we reject Rosenberg's interpretation, which would deny a civil remedy for an attempted deceit which could support a criminal prosecution under the same statute.[41]

Therefore, in light of the absence of controlling decisional case law, the penal law origins of § 487, and the language of the statute, we conclude that the New York Court of Appeals would hold that an attempted deceit upon a court is sufficient to trigger liability under § 487.[42] Accordingly, we find that even if Rosenberg's attempts to deceive Judge Gammerman were unsuccessful, he still would be liable under § 487.[43]

### III. Damages

■ Lastly, there is no issue that the Amalfitanos were damaged by Rosenberg's deceit. From the onset of the Costalas litigation, through the appeal, and on remand, plaintiffs were forced to pay the costs of defending themselves against an action which was founded upon the deceitful premise that Peter was still a partner in 27 Whitehall Street Group. The ensuing costs incurred by the Amalfitanos in litigating the dispute were a direct result of this deception.

However, we find that the costs incurred by the Amalfitanos in opposing Rosenberg's November 5, 2004, motion to vacate the judgment and his subsequent appeal of the denial of this motion were not caused by Rosenberg's deceit. In both instances, Rosenberg did not attempt to deceive the courts further, but rather relied on arguments related to Hahn's purported *ex parte* communications with Judge Gam-

---

**41.** The converse argument, that an attempted deceit would not criminally be punishable, would lead to a greater distortion of the fabric of New York penal law. *See Travelers Ins. Co.*, 14 F.3d at 119.

We are mindful that under our interpretation of § 487, a defendant who is criminally liable for an attempted deceit could still escape civil liability in those cases where the plaintiff is unable to allege any damages caused by the attempted deceit. We are not troubled by this result, in light of the statute's express requirement that there be damages.

**42.** We also note that in view of the fact that § 487 is designed to protect "the integrity of the truth-seeking processes of the New York courts," *see Schertenleib*, 589 F.2d at 1166, it seems incongruous to conclude that liability would hinge upon a judge's capacity to ferret out the deceit. The level of misconduct targeted under this statute is sufficiently egregious such that policy considerations weigh in favor of mandating both criminal and civil

liability for *any* attempt at deceiving the court.

**43.** We are mindful of the concern that this holding would open the door for liability under § 487 even for attempted deceit upon a party (an offense which presumably would not be viewed as seriously as an attempted deceit upon the court). At first glance, this would seem to be a reasonable fear, given that the wording of § 487 does not differentiate in any way between deceiving the court and deceiving a party to the litigation. However, such concerns are minimized by the fact that any party who was not actually deceived by the defendant's false statements would be unable to establish the necessary damages to establish liability. *See Manna v. Ades*, 237 A.D.2d 264, 655 N.Y.S.2d 412 (2d Dep't 1997) (finding no violation of § 487 where a party was not deceived by the defendant's false statements). Any damages presumably would arise only if the attempted deceit was successful or if it was also directed at the court.

merman. Although the entire Costalas litigation was founded upon a deceptive premise, the causal link to the subsequent motion to vacate and its appeal, which made no mention of the underlying allegations, seems too attenuated.

■ Therefore, we find that plaintiffs' damages arising from Rosenberg's deceit are reflected in the costs listed in the Bill Summary through December 1, 2003, which total $89,415.18. *See* Pl.Ex. 113. Plaintiffs are entitled to this amount trebled, or $ 268,245.54. However, plaintiffs are not entitled to pre-verdict interest. This action does not fall within the ambit of C.P.L.R. 5001,[44] and it specifically has been held that it is inappropriate to include interest in the treble damage calculation under § 487. *See Resnick v. Socolov,* 5 A.D.3d 125, 126, 771 N.Y.S.2d 889, 890 (1st Dep't 2004) (noting that "preverdict interest is inconsistent with an award of treble damages under Judiciary Law § 487").[45]

## V. Plaintiffs' Motion for Partial Judgment and Request for Order

Because we decide both the issues of liability and damages, plaintiffs' motion for partial judgment is moot. Plaintiffs' request for an order directing an examination of Rosenberg's assets and restraining him from transferring or dissipating such assets pending entry of judgment is grant-

ed. *See Sequa Capital Corp. v. Nave,* 921 F.Supp. 1072, 1076 (S.D.N.Y.1996).

## CONCLUSION

For the reasons set forth above, we find that Rosenberg has violated § 487. Plaintiffs are directed to submit a judgment on notice.

Moreover, the record raises issues beyond the § 487 claim presented. Specifically, the trial record is replete with ethical and professional lapses by Mr. Rosenberg and a testimonial response that was devoid of any apparent recognition that lapses had occurred. Rather, Mr. Rosenberg seemed to have little understanding of the Rules of the Chief Administrator of the Courts of the State of New York governing "Awards of Costs and Imposition of Financial Sanctions for Frivolous Conduct in Civil Litigation," §§ 130–1.1––130–1.5 and the Federal counterpart, Fed.R.Civ.P. 11. Indeed, he affirmatively asserted the right to present to the court a position or document simply because he received it from a client without interposing his evaluation of that position or document, regardless of his knowledge of its merits or authenticity. Under these circumstances, we respectfully request the Clerk of this Court to forward a copy of this opinion to the Committee on Grievances of the Southern District of New York and to the Disciplinary Committee of the New York State Judicial department in which Rosenberg is

---

44. C.P.L.R. 5001 in relevant part states:
   (a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.
   N.Y. C.P.L.R. 5001(a) (McKinney 2006).

45. *Burton v. Kaplan,* 184 A.D.2d 408, 408–09, 585 N.Y.S.2d 359, 360 (1st Dep't 1992) (noting that "court properly awarded damages based on the interest which would have been earned on the funds during the period they were misappropriated and properly trebled that award pursuant to Judiciary Law § 487(2)") is distinguishable, as in that case the defendant attorney had misappropriated his former clients' funds, thus bringing the matter under C.P.L.R. 5001.

admitted to practice, for such action as they deem proper.

**IT IS SO ORDERED.**